# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

MARSHALL TAYLOR,              :

      Plaintiff,               :

vs.                        :       CA 13-0062-C

CAROLYN W. COLVIN,       :
Acting Commissioner of Social Security,
                              :

      Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff brings this action, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income. The parties have consented to the exercise of jurisdiction by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court. (Docs. 23 & 25 ("In accordance with the provisions of 28 U.S.C. 636(c) and Fed.R.Civ.P. 73, the parties in this case consent to have a United States Magistrate Judge conduct any and all proceedings in this case, . . . order the entry of a final judgment, and conduct all post-judgment proceedings.").) Upon consideration of the administrative record, plaintiff's brief, the Commissioner's brief, and the parties' arguments during the hearing conducted on November 21, 2013, it is determined that the Commissioner's decision denying plaintiff benefits should be affirmed.[1]

---

[1]     Any appeal taken from this memorandum opinion and order and judgment shall be made to the Eleventh Circuit Court of Appeals. (*See* Docs. 23 & 25 ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of
(Continued)

Plaintiff alleges disability due to degenerative disc disease of the C-spine, chronic left shoulder pain, post-traumatic stress disorder ("PTSD"), depression, mood disorder, NOS, and chronic pain. The Administrative Law Judge (ALJ) made the following relevant findings:

> **1.      The claimant meets the insured status requirements of the Social Security Act through September 30, 2013.**
>
> **2.      The claimant has not engaged in substantial gainful activity since March 15, 2008, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).**
>
> **3.      The claimant has the following severe impairments: polysubstance abuse, cervical disc disease, and post-traumatic stress disorder with obsessive-compulsive disorder (20 CFR 404.1520(c) and 416.920(c)).**
>
> .        .        .
>
> The claimant has received primary health care through the VA system since at least 2004. Progress notes reflect treatment for tremor, depression, post-traumatic stress disorder, obsessive-compulsive disorder, alcohol abuse and dependence, cocaine abuse and dependence, cannabis dependence in remission, cervical disc disease, shoulder pain, joint pain, mild sensorineural hearing loss, presbvopia, and dry eyes. Past drug screens have been positive for cocaine and marijuana.
>
> .        .        .
>
> The claimant reported on May 28, 2009, that he had used alcohol to the point of intoxication 7 days within the past week, and that he had used cocaine once during the past week.
>
> The claimant was [] admitted to the VA Medical Center in Biloxi, Mississippi, on June 18, 2009, for a substance abuse treatment program. The diagnoses were cocaine and alcohol dependence and the examiner noted a long history of failed outpatient substance abuse treatment. For reasons that are unclear, the claimant was discharged from the Biloxi VA

Appeals for this judicial circuit in the same manner as an appeal from any other judgment of this district court."))

and resumed in-patient treatment at the VA Medical Center in White City, Oregon.[2]

Martin B. Lahr, M.D., a state agency physician, reviewed the evidence of record on September 18, 2009, and completed a residual functional capacity assessment on which he estimated that the claimant could lift and carry 10 pounds frequently and 20 pounds occasionally. He estimated that during an 8-hour workday, the claimant could stand and walk for up to 6 hours and sit for at least 6 hours. He indicated that the claimant was limited to occasional climbing of ladders, ropes and scaffolds, and that he was limited in ability to perform overhead reaching and fine manipulation.

On September 21, 2009, Dorothy Anderson, Ph.D., a state agency psychologist, completed a psychiatric review technique form on which she indicated that the claimant had affective, anxiety, and substance abuse disorders resulting in moderate limitations of social functioning and concentration, persistence or pace. She reported that the claimant was not limited in daily activities, that there were no episodes of decompensation, and that the "C" criteria were not present. Dr. Anderson also completed a mental residual functional capacity assessment on which she estimated that the claimant was moderately limited in ability to carry out detailed instructions, in ability to maintain attention and concentration for extended periods, in ability to work in proximity to others without being distracted, in ability to interact with the general public, and in ability to respond appropriately to co-workers. . . . She concluded that the claimant could occasionally interact with the public and with co-workers. She stated that his impairments would disrupt attention and concentration with regard to detailed or complex tasks. She recommended independent work and stated that he would benefit from assistance in setting realistic goals.

During his hospitalization in Oregon, the claimant seems to have had some degree of conflict with fellow patients and, on one occasion, another veteran placed a rope around the claimant's neck during a therapy session. The claimant was understandably upset about the incident and [ultimately] left the hospital. His discharge was dated January 9, 2010. His condition was described as improved. Diagnoses upon discharge were cocaine dependence, alcoholism, obsessive-compulsive disorder, post-traumatic stress disorder, shoulder pain, erectile dysfunction, generalized anxiety disorder, obsessive-compulsive personality, social phobia, depression, tremor[s] and hemorrhoids.

---

[2]    While perhaps not apparent to the ALJ, it is clear from the evidence that Taylor applied to the long-term in-patient program offered by the VA Medical Center in White City, Oregon and was accepted. (*Compare* Tr. 447 *with* Tr. 618.)

The claimant was seen at the Biloxi VA on January 19, 2010, and reported a recent alcohol relapse. He described symptoms of anxiety. He stated that, while in the military, he had witnessed the deaths of some fellow service members and a female civilian. He complained of nightmares, flashbacks, paranoia, and hyper[]vigilance. VA psychiatrist Juliana Fort, M.D., stated on February 2 that the claimant was disabled and had difficulty with day-to-day functioning even within an intensive residential treatment program.

On March 10, 2010, a VA drug screen was positive for cocaine.

Robert G. Haas, M.D., a state agency physician, reviewed the evidence on March 24, 2010, and reported that he concurred with Dr. Lahr's conclusions.

On March 25, 2010, state agency physician Robert Estock, M.D., completed a psychiatric review technique form on which he indicated that the claimant had affective, anxiety, and substance abuse disorders resulting in mild limitation[s] of activities of daily living and moderate limitations of social functioning and concentration, persistence or pace. He reported that there were no episodes of decompensation and that the "C" criteria were not present. Dr. Estock also completed a mental residual functional capacity assessment on which he estimated that the claimant was moderately limited in ability to understand, remember, and carry out detailed instructions; in ability to maintain attention and concentration for extended periods; in ability to work in proximity to others without being distracted; in ability to interact with the general public; and in ability to respond appropriately to co-workers. He concluded that the claimant could understand, remember, and carry out short, simple instructions, and that he could handle detailed instructions if broken down into 1-2 step instructions and rehearsed adequately. He stated that attention was adequate to perform simple work for 2-hour periods without special supervision or rest periods.

State agency physician Richard Whitney, M.D., conducted a review of the evidence on March 26, 2010, and completed a residual functional capacity assessment on which he estimated that [] the claimant could lift and carry 10 pounds frequently and 20 pounds occasionally. He estimated that, during an 8-hour workday, the claimant could stand and walk for up to 6 hours and sit for at least 6 hours. He indicated that the claimant was unable to climb ladders, ropes and scaffolds. He reported that the claimant was limited in ability to perform bilateral overhead reaching and in ability to perform frequent fine manipulation. He indicated that the claimant should avoid concentrated exposure to hazards.

Dr. Fort reported on April 6, 2010, that the claimant was unable to tolerate pain due to physical and psychological factors. She noted "severe" cervical radiculopathy, shoulder pain and a tremor.

The claimant was admitted to the Biloxi facility on June 9, 2010. He reported that he was supposed to have remained in treatment at the Oregon facility for 2 years, but that he had returned to the Gulf Coast in January 2010. The examiner noted that the claimant had a regular discharge from the White City VA and that no problems were noted. The claimant stated that he had started using alcohol in January 2010 and cocaine in March 2010. The examiner observed that the claimant was unable to focus on his issues upon admission, but that he was started back on Celexa and trazadone and demonstrated improvement within 72 hours. He was discharged on June 14 and resumed participation in the substance abuse treatment program on June 18; it is unclear from the record whether the program was an in-patient program.

VA records from September 2010 indicate that the claimant reported that he relapsed in June 2010. He stated in October 2010 that he last used alcohol and cocaine in April 2010.

John B. Howell, M.D., a VA physician[,] completed a physical capacities evaluation of the claimant on November 15, 2010. He estimated that the claimant could lift and carry 20 pounds occasionally to 10 pounds frequently. He reported that the claimant could sit, stand, and walk for respective totals of 8 hours. He indicated that the claimant could rarely perform gross or fine manipulation or reaching. He indicated that the claimant could occasionally push, pull, operate motor vehicles, and work around hazardous machinery. Dr. Howell reported that the claimant could be expected to be absent from work one day per month. He attributed the claimant's limitations to left arm and shoulder pain with restriction of motion due to pain. Dr. Howell also completed a clinical assessment of pain [form] on which he indicated that the claimant experienced pain that was distracting to the adequate performance of daily activities or work, and that physical activity could be expected to aggravate the claimant's pain to such an extent as to cause distraction from or abandonment of tasks. He specified that physical activity referred to overhead lifting on the left. He stated that medication side effects would not create serious problems in most instances.

A VA note dated December 26, 2010, reflects that the claimant had recently overdosed with thoughts of self-harm. He stated in January 2011 that he had been sober since September 2010. At that time, he was diagnosed with post-traumatic stress disorder, alcohol abuse, and cocaine abuse in partial remission.

The record indicates that the claimant has had intermittent medical care through the VA for a variety of physical ailments. On May 27, 2009, the claimant complained of an essential tremor that had been present since childhood, but that had worsened. An examiner noted on June 22 that the claimant's left shoulder was higher than the right, but that range of motion was normal. A tremor was noted. The physician suspected

exophthalmos possibly related to hyperthyroidism. The claimant was also diagnosed with hemorrhoids, chronic left shoulder pain, cocaine and alcohol dependence, and substance-induced depression at that time. The claimant reported on June 3 that he walked daily for exercise.

On July 13, 2009, the claimant underwent left shoulder and cervical spine x-rays. The left shoulder x-rays were negative. The cervical spine x-rays demonstrated moderately severe degenerative disc disease at C5-6 and C6-7.

The claimant was evaluated for left knee pain on December 9, 2009. He also reported back pain, a history of a small stroke in 1995 with left hemiparesis and left arm numbness that persisted for a while thereafter, and increasing left shoulder pain since 2005. Left knee x-rays were negative. The physician noted that ambulation was somewhat affected by the knee. It was concluded that he had a 10% service-connected disability. The claimant reported on December 21 that a TENS unit was very effective in relieving his neck and shoulder pain, and that he had decreased his medication usage from four times a day to twice a day. He underwent a left shoulder magnetic resonance imaging scan on December 28. The results demonstrated mild acromioclavicular arthrosis with minimal impression on the supraspinatus musculotendinous junction. The claimant underwent electromyography on January 10, 2010. The results were within normal limits.

On May 26, 2010, the claimant had left shoulder and cervical spine x-rays. The left shoulder x-rays were normal; however, the cervical spine series revealed degenerative disc disease at C5-6 and C6-7.

.     .     .

Philip L. Cenac, a VA psychiatrist, saw the claimant on February 26, 2011. The claimant reported that he was depressed, but that he had improved. Dr. Cenac noted a suicide attempt in November 2010. He diagnosed cocaine dependence in remission, mood disorder due to general medical condition and cocaine-induced mood disorder, and post-traumatic stress disorder.

Ernest Hudson, D.O., a VA psychiatrist, evaluated the claimant on April 25, 2011. The claimant reported occasional fleeting suicidal ideation without intent. Dr. Hudson noted depressed mood. He saw the claimant again on May 23. He reported a normal mental examination and stated that the claimant was tolerating his medications well and that his symptoms were improving.

On June 23, 2011, Dr. Hudson completed a mental residual functional capacity assessment of the claimant on which he reported that the claimant was markedly to extremely impaired in all areas of functioning.

He stated that the limitations were persistent despite more than one year of abstinence and compliance with therapy and medications.

**4.     The claimant's impairments, including the substance use disorders, meet sections 12.04, 12.06, and 12.09 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR  404.1520(d) and 416.920(d)).**

The claimant's mental impairments, including the substance use disorders, meet listings 12.04, 12.06, and 12.09. The "paragraph A" criteria are satisfied because the claimant has specific symptoms of depression, such as feelings of guilt, difficulty concentrating, suicidal ideation, and paranoid thinking, as well as symptoms of anxiety  such as obsessive-compulsive behavior, flashbacks, and hyper-vigilance. His depression and anxiety meet the "A" criteria of [] Listing 12.09. To satisfy the "paragraph B" criteria, the impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. A marked limitation means more than moderate but less than extreme. Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting at least 2 weeks.

In activities of daily living, the claimant has marked restriction. In social functioning, the claimant has moderate difficulties. With regard to concentration, persistence or pace, the claimant has marked difficulties. The claimant has experienced no episodes of decompensation of extended duration.

Because the claimant's mental impairments, including the substance use disorders, cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, the "paragraph B" criteria are satisfied.

In the disability report filed with his application, the claimant alleged that he was unable to work due to pain and inability to concentrate as a result of post-traumatic stress disorder. After careful consideration of all the evidence, the undersigned finds that the claimant is credible concerning his alleged mental symptoms and limitations. The evidence of record reflects that examining psychologists and psychiatrists have considered him to be disabled and have repeatedly estimated global assessments of functioning in the 45-50 range, which, according to the *Diagnostic and Statistical Manual of Mental Disorders* (4th edition) (*DSM-IV*), indicates serious symptoms or serious limitations of social or occupational functioning.

I give substantial weight to the assessments of Doug Ewing, M.D., Randal Caffarel, M.D., Damon Robinson, Ph.D., and Dr. Fort, which reflect that the claimant is markedly limited in functioning from a mental standpoint.

Their opinions are well supported by their own clinical examinations and testing, as discussed above, and are generally consistent with the record as a whole.

**5.      If the claimant stopped the substance use, the remaining limitations would cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore, the claimant would continue to have a severe impairment or combination of impairments.**

The claimant has maintained periods of abstinence, but his depression and anxiety, though improved, are persistent. It can therefore be concluded that, even if the claimant were to discontinue all substance abuse, his remaining limitations would cause more than a minimal impact on his ability to perform basic work activities.

**6.      If the claimant stopped the substance use, the claimant would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)).**

The claimant's musculoskeletal impairments do not result in inability to ambulate effectively or inability to perform fine and gross movements, and therefore are not of the level of severity contemplated at Medical Listing 1.01.

If the claimant stopped the substance use, the remaining limitations would not meet or medically equal the criteria of listings 12.04 or 12.06. In terms of the "paragraph B" criteria, the claimant would have mild restriction in activities of daily living if the substance use was stopped. In social functioning, the claimant would have moderate difficulties if the substance use was stopped. With regard to concentration, persistence or pace, the claimant would have moderate difficulties if the substance use was stopped. The claimant would experience no episodes of decompensation if the substance use was stopped.

Because the remaining limitations would not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, the "paragraph B" criteria would not be satisfied if the claimant stopped the substance use.

The undersigned has also considered whether the "paragraph C" criteria would be satisfied. In this case, these criteria would not be met if the claimant stopped the substance use. Specifically, there is no indication of repeated episodes of decompensation, each of extended duration; a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or current history of 1 or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for

such an arrangement. With regard to anxiety, there is no indication of complete inability to function independently outside the area of one's home.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments. Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

**7.       If the claimant stopped the substance use, he would have the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he is unable to perform overhead reaching; he is limited to no more than occasional reaching, handling, fingering, feeling, pushing and pulling with the non-dominant arm; he is limited to occasional use of foot controls, climbing of stairs and ramps, bending, stooping, and crouching; he is unable to climb ladders, scaffolds or ropes; he is unable to kneel, crawl, or work around unprotected heights or dangerous equipment; he is unable to perform complex or detailed job tasks;  he is unable to work around crowds; he is limited to occasional public contact; he is limited to work in an environment where changes in the work setting would be minimal; and he can make judgments only on simple work-related decisions. He is able to perform short, simple tasks and jobs with 1-2 instructions or steps.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s)— i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence,

and limiting effects of the claimant's symptoms to determine the extent to which the they limit the claimant's ability to do basic work activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by the objective medical evidence, the undersigned must make a finding on the credibility of the statements based on a consideration of the entire case record.

At the hearing, the claimant testified as follows: He was born on June 5, 1960, and is 51 years old. He is separated from his current wife and lives with his ex-wife. She works. They live in an apartment. He gets $123.00 monthly for a service-connected left knee impairment. He is right-handed. He can read and print. He was in the army from January 1, 1980, through December 31, 1983. . . . He has left neck and shoulder pain. He uses a TENS unit. Pain medication makes the pain bearable. The pain got bad after he went off drugs. He may have surgery. He was in Oregon trying to get his life together in treatment. He was sent to Mississippi and then came to Mobile. He has screaming inside. He takes medication. It helps some. Every Monday he has called the hotline about suicide. He can walk for about an hour and then his knee hurts and his feet swell. Standing makes his neck hurt after 30 minutes. He takes the trash out and washes the dishes. He doesn't go to church because he thinks people laugh at him. His license is suspended because he got a ticket and didn't pay it. He last used cocaine in January 2010. He last used alcohol when he had a beer on Father's Day. . . . He has headaches every day. It could be from his neck. He takes pain medication. He has post-traumatic stress disorder. He wants to be left alone. He gets angry when he thinks people are laughing. He has thoughts of hurting himself. Pills make him go to sleep fast, but he has nightmares and sleepwalks. He can't focus on TV. He uses the TENS unit for 90 minutes at a time.

If the claimant stopped the substance use, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below.

The  record reflects that the claimant has an extensive history of substance abuse for most of the period of time covered by the records. The available evidence does suggest that his symptoms are significantly aggravated by substance abuse and improved with abstinence. His depression has been described as substance-induced and cocaine-induced mood disorder was diagnosed as recently as February 2011. Records from June 2010 indicate that the claimant demonstrated rapid improvement with abstinence and resumption of psychotropic medications. The most current treatment notes indicate normal findings and good improvement with treatment.

One would not expect a complete remission of depression, anxiety and associated obsessive-compulsive traits, even with prolonged abstinence. Nevertheless, given the claimant's demonstrated capacity for improvement with abstinence, as well as his excellent work history, it is reasonable to suppose that he will be able to return to functional status once his alcohol and drug abuse are in full sustained remission. I find that, with abstinence, the claimant could perform work that involves short, simple tasks with 1-2 instructions or steps but not complex or detailed job tasks; that does not require him to be around crowds; that requires no more than occasional public contact; that is performed in an environment where changes in the work setting would be minimal; and that does not require any more than simple work-related decisions. I further find that, assuming prolonged abstinence from all substance abuse, the residual functional capacity assessments completed by Dr. Anderson and Dr. Estock represent reasonable estimates of functioning consistent with the VA treatment records.

I have considered Dr. Fort's disability statement and Dr. Hudson's residual functional capacity assessment. I note that Dr. Fort's statement was propounded during a period of active substance abuse on the part of the claimant and cannot be considered applicable to his condition when abstinent. Moreover, Dr. Hudson's assessment is not supported by his own treatment notes, which indicate excellent improvement from April 2011 to May 2011 and a completely normal mental status examination in May. It is also noted that "partial remission" was diagnosed as recently as January 2011, despite Dr. Hudson's assertion that the claimant had been sober for more than a year as of April 2011. In fact, records from 2010 in particular are quite unclear as to when the claimant stopped using, and, as noted, it is not clear that the claimant had discontinued all substance abuse even by 2011. In any event, the marked to extreme limitations described by Dr. Hudson are significantly disproportionate to his reported examination findings and cannot be considered persuasive, whether or not the effects of substance abuse are considered.

The claimant reports chronic left-sided neck and shoulder pain. Left shoulder x-rays have been normal, and magnetic resonance imaging reveals only minor degenerative change. On the other hand, cervical spine x-rays demonstrate moderately severe degenerative disc disease at C5-6 and C6-7. Nevertheless, the claimant has sought only intermittent treatment despite extensive access to medical care. He has reported good relief with a TENS unit and has not attempted to obtain further work-up or treatment for his cervical disc disease. I have considered Dr. Howell's physical capacities evaluation and clinical assessment of pain, but note that he specified that the stated limitations referred to the claimant's left arm symptoms. I give Dr. Howell's physical capacities evaluation significant weight, but I find there is no objective evidence of cervical radiculopathy; electromyography was within normal limits. There is thus no basis for concluding that the claimant cannot perform at least occasional reaching, handling, fingering, feeling, and pushing and pulling

with the left arm. Overall, the reported severity of symptoms is in excess of objective findings.

I find that the claimant can perform light work except that he is unable to perform overhead reaching; he is limited to no more than occasional reaching, handling, fingering, feeling, pushing and pulling with the non-dominant arm; he is limited to occasional use of foot controls, climbing of stairs and ramps, bending, stooping, and crouching; he is unable to climb ladders, scaffolds or ropes; and he is unable to kneel, crawl, or work around unprotected heights or dangerous equipment.

It is noted that the claimant has a history of left knee pain. X-rays are within normal limits and a VA physician stated in June 2009 that the claimant was cleared for physical activity with only limitation being left shoulder pain. Treatment has been at best minimal, although the claimant evidently has a 10% service-connected disability for knee pain. . . . Even if the claimant does have some intermittent knee pain, there is no reason to suppose that he could not perform activities within the stated residual functional capacity.

.     .     .

**8.     If the claimant stopped the substance use, the claimant would be unable to perform past relevant work (20 CFR 404.1565 and 416.965).**

The claimant has past relevant work as [a] nurse's aide, janitor, and door assembler. At the hearing, the vocational expert was asked to classify the claimant's past work by skill and exertional level. He responded that the claimant's experience as a nurse's aide (*Dictionary of Occupational Titles* No. 354.377-0140) represented medium semi-skilled work with a specific vocational preparation (SVP) level of 3; that his experience as a janitor (*DOT* No. 381.687-018) represented medium unskilled work; and that his experience as a door assembler (*DOT* No. 351.966-010) represented medium semi-skilled work at SVP 3. The vocational expert was then asked to consider the availability of any of the claimant's past work, assuming the residual functional capacity set forth above. He responded that the stated limitations would preclude performance of any of the claimant's past relevant work.

Accordingly, it is concluded that the claimant would not be able to perform past relevant work if he stopped substance use.

**9.     The claimant was born on June 5, 1960, and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).**

**10.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).**

**11.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).**

**12.     If the claimant stopped the substance use, considering the claimant's age, education, work experience, and residual functional capacity, there would be a significant number of jobs in the national economy that the claimant could perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).**

.     .     .

If the claimant stopped the substance use, the claimant would not have the residual functional capacity to perform the full range of light work. To determine the extent of erosion of the unskilled light occupational base caused by the limitations that would remain, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and the residual functional capacity the claimant would have if he stopped the substance use. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative unskilled light occupations such as cafeteria attendant (*DOT* No. 311.677-010), with 1,200 such jobs existing statewide and 300,000 nationally; custodian or housekeeper (*DOT* No. 323.687-014), with 5,400 such jobs existing statewide and 900,000 nationally; and packer (*DOT* No. 920.685-026), with 1,250 jobs existing statewide and 325,000 nationally.

Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the *Dictionary of Occupational Titles.*

Based on the vocational expert's testimony, the undersigned concludes that, if the claimant stopped the substance use, he would be capable of making a successful adjustment to work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of 202.21.

**13.     Because the claimant would not be disabled if he stopped the substance use (20 CFR 404.1520(g) and 416.920(g)), the claimant's substance use disorders [are] . . . contributing factor[s] material to the determination of disability (20 CFR 404.1535 and 416.935).     Thus, the claimant has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision.**

(Tr. 12-13, 13, 13-16, 16, 16-19, 19, 19-20, 20, 20-21, 21, 22 & 23 (emphasis in original; internal citations omitted; footnote added).) The Appeals Council affirmed the ALJ's decision (Tr. 1-3) and thus, the hearing decision became the final decision of the Commissioner of Social Security.

## DISCUSSION

In making a social security disability determination, the Commissioner employs a five-step sequential evaluation process. *Phillips v. Barnhart,* 357 F.3d 1232, 1237 (11th Cir. 2004). The claimant bears the burden of proof at each of the first four steps of the process, which are: (1) whether he is currently performing substantial gainful activity; (2) whether he has severe impairments; (3) whether his severe impairments meet or medically equal a listed impairment; and (4) whether he can perform his past relevant work. *See id*. at 1237-1239. It is only at the fifth step of the sequential evaluation process that the burden shifts to the Commissioner, who must establish that there are a significant number of jobs in the national economy that the claimant can perform. *See id* at 1239-1240. In addition to the foregoing, the Contract with America Advancement Act of 1996 ("CAAA"), codified as amended at 42 U.S.C. § 423(d)(2)(C), "amended the Social Security Act to preclude the award of benefits when alcoholism or drug addiction is determined to be a contributing factor material to the determination that a claimant is disabled." *Doughty v. Apfel,* 245 F.3d 1274, 1275 (11th Cir. 2001). Therefore, in those cases in which the Commissioner "determines a claimant to be disabled and finds medical evidence of drug addiction or alcoholism, the Commissioner then 'must determine whether . . . drug addiction or alcoholism is a contributing factor material to the determination of disability.'" *Id*. at 1279, quoting 20 C.F.R. § 404.1535. The Eleventh Circuit went on to note that the "key factor in determining whether drug addiction or alcoholism is a contributing factor material to the determination of a disability . . . is

14

whether the claimant would still be found disabled if he stopped using drugs or alcohol." *Id.*, citing 20 C.F.R. § 404.1535(b)(1). As for who bears the burden of proof with respect to this materiality determination, the *Daughty* court agreed with the Fifth Circuit's decision in *Brown v. Apfel*, 192 F.3d 492 (1999) and held that "the claimant bears the burden of proving that his alcoholism or drug addiction is not a contributing factor material to his disability determination." *Id.* at 1280 (other citation omitted); *see also id.* at 1276 ("We hold, as a matter of first impression in this Circuit, that the claimant bears that burden.").

As reflected above, the ALJ effectively performed the first three steps of the required five-step sequential analysis twice and steps four and five once. In performing the first inquiry, the ALJ assumed Taylor was still using alcohol and perhaps drugs. (*Compare* Tr. 17 *with* Tr. 18.) At step one, the ALJ determined that plaintiff has not engaged in substantial gainful activity since March 15, 2008, the alleged disability onset date. (Tr. 12.) At step two, the ALJ determined that Taylor suffers from the following severe impairments: "**polysubstance abuse, cervical disc disease, depression, and post-traumatic stress disorder with obsessive-compulsive disorder**[.]" (Tr. 13.) And at the third step, the ALJ found that claimant's impairments, including the substance use disorders, meet sections 12.04, 12.06, and 12.09 of the Listings of Impairments (Tr. 17.) The ALJ then shifted his inquiry to make findings as "[**i**]**f the claimant [had] stopped the substance use**[.]" (Tr. 18.) In this second inquiry, the ALJ found at step two that "**the remaining limitations would cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore, the claimant would continue to have a severe impairment or combination of impairments.**" (*Id.*) At the third step, the ALJ determined that absent substance use Taylor "**would not have an impairment or combination of impairments that meets or medically equals any of the**

**[listed] impairments[.]"** (*Id.*) The ALJ found that absent substance use, the claimant **"would have the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he is unable to perform overhead reaching; he is limited to no more than occasional reaching, handling, fingering, feeling, pushing and pulling with the non-dominant arm; he is limited to occasional use of foot controls, climbing of stairs and ramps, bending, stooping, and crouching; he is unable to climb ladders, scaffolds or ropes; he is unable to kneel, crawl, or work around unprotected heights or dangerous equipment; he is unable to perform complex or detailed job tasks; he is unable to work around crowds; he is limited to occasional public contact; he is limited to work in an environment where changes in the work setting would be minimal; and he can make judgments only on simple work-related decisions. He is able to perform short, simple tasks and jobs with 1-2 instructions or steps."** (Tr 19.) At step four, the ALJ concluded that the plaintiff **"would be unable to perform past relevant work[.]"** (Tr. 21.) However, at step five, the ALJ determined that in light of the vocational expert's testimony, and within the framework of Rule 202.21 of the Medical-Vocational Guidelines, **"there would be a significant number of jobs in the national economy that the claimant could perform"** should plaintiff stop the substance use. (Tr. 22) Because the ALJ determined that substance use was a contributing factor material to the determination of disability, she concluded that Taylor was not under a disability from March 15, 2008 through the date of the decision (August 3, 2011). (Tr. 23.)

This Court reviews a social security disability case to determine whether the Commissioner's decision is supported by substantial evidence and whether the ALJ applied the correct legal standards. *See, e.g.*, *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997). Substantial evidence is defined as more than a scintilla and means such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *compare also Somogy v. Commissioner of Social Security*, 366 Fed.Appx. 56, 62 (11th Cir. Feb. 16, 2010) ("Substantial evidence is more than a scintilla . . . ." (citation omitted)) *with Hillsman v. Bowen,* 804 F.2d 1179, 1181 (11th Cir. 1986) (an ALJ's decision "cannot stand with a 'mere scintilla' of support[]"). Even if the evidence preponderates against the Commissioner's decision, that decision must be affirmed if it is supported by substantial evidence. *Compare id.* ("The decision of the ALJ need not be supported by a preponderance of the evidence[.]") *with Sewell v. Bowen,* 792 F.2d 1065, 1067 (11th Cir. 1986) ("Even if the evidence preponderates against the [Commissioner], we must affirm if the decision is supported by substantial evidence."). And while this Court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner,]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11ᵗʰ Cir. 1990) (citation omitted), it nonetheless "must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ[,]" *Tieniber v. Heckler,* 720 F.2d 1251, 1253 (11th Cir. 1983) (citations omitted); *see also Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) ("In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision.").

With these principles in mind, the undersigned turns to a consideration of the three issues raised by the plaintiff in this case, that is, his arguments that: (1) the ALJ's RFC assessment lacks the support of substantial evidence in light of her rejection of treating source opinions; (2) the ALJ erred in finding that substance abuse was a contributing factor material to the determination of his disability; and (3) the ALJ failed to articulate or apply the three-part pain standard. (Doc. 16, at 4.) This Court's focus will

be upon the second issue raised by plaintiff and from a discussion of whether the ALJ properly determined that Taylor's drug addiction or alcoholism is a contributing factor material to the determination of disability the undersigned will consider plaintiff's "RFC" and "pain" contentions. That this is the correct approach is clear given plaintiff's argument in his brief that the opinions of his treating psychiatrists, Drs. Fort and Hudson, support his contention that polysubstance abuse is not material in determining disability since both psychiatrists treated him during periods of sobriety and indicated his inability to work during those periods.

As aforesaid, plaintiff contends that the ALJ erred in finding that substance abuse was a contributing factor material to the determination of his disability. The undersigned cannot agree with plaintiff in this regard since a review of the ALJ's decision in this case reveals a copious review of all record evidence from the alleged onset date of March 15, 2008 through the date of the decision and a detailed explanation by the ALJ of why the evidence in the record as a whole supports the conclusion that Taylor's substance abuse is a material contributing factor. In other words, contrary to plaintiff's contention, substantial evidence supports the ALJ's conclusion that substance abuse is a contributing factor material to plaintiff's disability and plaintiff, as a consequence, has not carried his burden of proving that his alcoholism or drug addiction is not a contributing factor material to his disability determination.

The ALJ's essential "two-time" performance of the first three steps of the five-step sequential inquiry, and then one consideration of steps four and five, as synopsized above, certainly reflects that the hearing officer drafted her decision in compliance with 20 C.F.R. §§ 404.1535 and 416.935, which are the sections of the regulations which address how the Commissioner is to go about determining whether a claimant's drug addiction or alcoholism is a contributing factor material to the determination of

disability. The undersigned would note that there are a plethora of references in the record to plaintiff's abuse of alcohol and drugs exacerbating his mental impairments—or, at the very least, linking his substance use to his mental impairments—or, otherwise, records indicating that when alcohol and drugs are taken away and psychiatric medications adjusted there is a concomitant decrease in symptoms. (*See, e.g.*, Tr. 330-469 & 1034-1155 (medical records from May 11, 2009 through June 15, 2009[3] from the Biloxi VA where plaintiff was accepted for an in-patient substance abuse treatment program before transferring to a long term residential treatment program in Oregon reflect plaintiff's report that he last used alcohol—a 6-pack—and cocaine—a "quarter"—on May 9, 2009[4];[5] reflect that when plaintiff started the program, and more specifically began participating in a depression group, he started with a moderate depression score and ended with a mild depression score; are littered with GAF scores ranging from 55 to 65, indicative of moderate to mild symptoms,[6] despite Taylor's self report that he was experiencing serious psychological problems, including serious depression and

---

[3]    During this period, despite reporting back, shoulder, and left knee pain (Tr. 466), plaintiff also reported that during the previous twelve months he engaged in numerous physical activities, including walking and active sports—football and basketball (Tr. 462).

[4]    A urine drug test on May 11, 2009 was positive for cocaine use. (Tr. 278.) On July 24, 2009, Taylor reported to his addiction therapist in Oregon that over the previous year "[h]e was using crack cocaine daily . . . [and] was drinking daily and drank at least a 6 pack of beer or a bottle of wine every day." (Tr. 640; *see also* Tr. 835 (on admission to the VA in Oregon on June 18, 2009, Taylor reported that on a typical day in the past year he had 10 or more drinks containing alcohol).)

[5]    On May 13, 2009, Taylor reported that he last used cannabis "over one year ago." (Tr. 459.) However, lab records reflect that plaintiff tested positive for cannabinoids—as well as cocaine—on October 6, 2008. (Tr. 279.) Moreover, there is evidence from mid-2008 that Taylor was actively abusing alcohol as he "agreed" on June 15, 2008 to "limit" his drinking to a maximum of "12 drinks per week . . . 2 drinks per occasion." (Tr. 534.)

[6]    *See* http://depts.washington.edu/washinst/Resources/CGAS/GAF (last visited Dec. 3, 2013).

anxiety[7]; and, as well, contain references to Taylor's stability—supported by clinical findings of his mood being euthymic with appropriate affect, thought process and content organized and logical with adequate insight and judgment—and ability to participate in the long term recovery program in Oregon); Tr. 486-513, 516 & 522-531 (VA records from January through March of 2009 reflect GAF scores indicative of serious problems but also reflect diagnoses of active cocaine and alcohol dependence and/or reports of quitting anti-depressant medication and having an increase in symptoms of depression/anxiety); Tr. 618 & 623 (initial psychiatric assessment consult from Dr. Alfred Frank Brem on June 25, 2009 at the VA Medical Center in White City, Oregon, noting Taylor's "history of depression intertwined with his substance abuse problems[]" and summarizing that Taylor appeared "to have intertwined problems with depression and substance abuse[]"); Tr. 818 (plaintiff's self-report to Dr. Robert J. Naymik on June 19, 2009 that "his depression [was] getting better now that he has been clean and sober[]"); Tr. 643, 787, 933-934, 939-941, 952-954, 959-960, 963-964, 967-985, 989-990, 1345, 1349-1430, 1439-1454, 1457-1461, 1464-1576, 1596-1617, 1626-1705 & 1727-1740 (VA records from Oregon reflecting that Taylor was progressing well in the long-term substance abuse from admission in June of 2009 to November of 2009, including working fulltime as a Section 4 Office Clerk, until his PTSD "around racial issues became activated during a treatment element [in ELP on November 4, 2009]" and he and the VA staff were unable to "affect" a resolution of the situation leading to claimant

---

[7]     This evidence certainly supports a finding that Taylor's cocaine and alcohol abuse were contributing factors material to the determination of disability inasmuch as on May 6, 2009, three days before Taylor reported that he last used alcohol and cocaine, his addiction therapist—whose report contains a diagnosis of post-traumatic stress disorder along with alcohol and substance abuse—determined his GAF score to be 45 (Tr. 475), indicative of serious symptoms.

leaving the long-term program on January 8, 2010, although Taylor ultimately "graduated" from the ELP program some five or six weeks later and indicated that he learned in ELP to focus not on the past but on the "here and now," indicated immediately after the "noose" incident that he wanted "to move on" and that he had accepted the apology of the guy who put the rope around his neck during ELP,[8] continued to work well after the incident—including 92 hours during the two-week periods of November 22, through December 5, 2009 and December 6 through December 19, 2009—and documented GAF scores of 52 on December 9, 2009, and again on December 16, 2009, despite diagnoses of chronic PTSD, obsessive-compulsive disorder, acute stress reaction, generalized anxiety disorder, alcohol abuse, and cocaine abuse, and reported that he felt really good and happy on December 3, 2009 because he was able to buy Christmas gifts for his family); Tr. 1403 (Dr. Mary Ann Montgomery's November 24, 2009 assessment that Taylor has "intertwined problems with depression and substance abuse[]"); Tr. 1183 (Dr. Juliana Fort's January 19, 2010 impression that Taylor's polysubstance dependency, primarily cocaine, alcohol and tobacco was only in partial remission and her feeling that claimant had a GAF score of 40); Tr. 2050 (Nurse Practitioner William Reasor's June 25, 2010 discharge diagnosis of "[c]ocaine induced mood disorder[,]" as well as cocaine dependence); Tr. 2053-2054 (June 16, 2010 notation by Dr. Angelos Vamvakas that once plaintiff was "placed back on Celexa and Trazadone as previously prescribed" he was able to talk about his cocaine addiction within 72 hours of his admission and that his diagnoses were cocaine induced mood

---

[8]    Interestingly, when Taylor returned to the Biloxi VA as a walk-in on January 19, 2010, the notes of the intake nurse reflect the following description of the incident: "Pt reports he was in [a] program in Oregon and there is documentation that he and others were putting 'nooses' around their neck. Pt states it was *a prank* and when he tried to tell his congressman about it, the VA 'shipped me out on a bus'." (Tr. 1026 (emphasis supplied).)

disorder and cocaine dependence with a GAF score of 35); Tr. 2067-2068 (January 13, 2011 notation by Dr. Jennifer M. Jackson that Taylor did not meet the DSM-IV criteria for a diagnosis of PTSD but that his Taylor's cocaine dependence was in early partial remission and that his current GAF score was a 52, indicative of moderate symptoms); Tr. 2074 & 2083 (Dr. Damon Robinson's November 18, 2010 and December 6, 2010 diagnoses of PTSD, alcohol abuse, and cocaine abuse in partial remission, along with a GAF score of 45); Tr. 2105 (Dr. Juliana Fort's August 3, 2010 diagnoses of PTSD, depressive disorder, polysubstance dependency (cocaine, alcohol and tobacco) in partial remission and a present GAF score of 45 to 50); Tr. 2204 (June 21, 2010 statement of problem by Biloxi VA addiction therapist Charlie E. Finkley: "Veteran is addicted to Alcohol and Cocaine as evidenced by repeated failures to stop usage/drinking. Vet has experienced *multiple psycho*-social *setbacks directly [related] to usage/drinking*." (emphasis supplied)); Tr. 2400 (Dr. Damon Robinson's April 23, 2010 diagnoses of PTSD, cocaine dependence, alcohol dependence in partial remission, and marijuana dependence in partial remission, along with a GAF score of 43); Tr. 2412 (Dr. Juliana Fort's April 6, 2010 diagnoses of PTSD, depressive disorder, polysubstance dependency (cocaine, alcohol and tobacco) in partial remission and a present GAF score of 45); Tr. 2429-2430 (Dr. Juliana Fort's March 4, 2010 diagnoses of PTSD, depressive disorder, polysubstance dependency (cocaine, alcohol and tobacco) in partial remission and a present GAF score of 45); Tr. 2444 (Dr. Juliana Fort's January 19, 2010 diagnoses of PTSD, depressive disorder, polysubstance dependency (cocaine, alcohol and tobacco) with a recent relapse on alcohol and a present GAF score of 40).) Moreover, a copious review of the clinical notes of Taylor's treating psychiatrist at the Biloxi VA, Dr. Juliana Fort, does not foreclose the appropriateness of the ALJ's determination that substance abuse is a contributing factor material to plaintiff's disability determination inasmuch

as Fort's clinical notes dated January 19, 2010 prominently note plaintiff's relapse on alcohol and that his polysubstance dependency was only in partial remission (Tr. 2444), and, some two weeks later, on February 2, 2010, the psychiatrist is only able to cryptically comment that plaintiff is disabled because "he even had difficulty functioning day to day within the intensive residential program." (*Id*. at 1173.)[9] Dr. Fort's conclusory opinion[10] in this regard, of course, betrays no indication that plaintiff's substance abuse does not exacerbate his mental impairments. Indeed, Dr. Fort's prominent mention of plaintiff's polysubstance dependency and recent relapse on alcohol in her "IMPRESSION" section on February 2, 2010, can certainly be read as suggesting that she was considering both mental and polysubstance impairments in rendering her opinion. (*See* Tr. 1174.)[11] Accordingly, the undersigned finds no error in

---

[9]    This comment by Dr. Fort represents a very myopic view of Taylor's day-to-day functioning at the VA Medical Center in White City, Oregon. As previously pointed out, Taylor worked fulltime—and even overtime—at that facility, at least through December 19, 2009, and had two GAF scores of 52—indicative of moderate symptoms—in December of 2009.

[10]    Being conclusory, it could have been rejected out-of-hand by the ALJ. *See Lewis, infra*, 125 F.3d at 1440. Moreover, Dr. Fort's opinion is contradicted by her action, on April 6, 2010, in approving Taylor to participate in the VA's transitional work experience ("TWE") program (Tr. 2414; *see also id.* ("TWE's **main goal** is to **return** the veteran to **community employment** at the end of the ninety day program." (emphasis supplied)).

[11]    Fort's February 2, 2010 diagnosis that plaintiff's polysubstance dependency was in partial remission (Tr. 1174) certainly belies plaintiff's argument that he was not using any substances in February 2010, as does his June 14, 2010 report to Dr. Angelos Vamvakas that in January of 2010 he initially began to use alcohol again, "1-2 beers *per day*[,]" and then "began using cocaine again in March 2010." (Tr. 2052 (emphasis supplied); *see also* Tr. 2341 ("Patient states he became angry at []his situation and began using initially just alcohol in January—1-2 beers *per day*. . . . Admits daily use of etoh (only admits 1-2 beers)[.]" (emphasis supplied); Tr. 2121 (on July 19, 2010, plaintiff admitted to drinking 2 to 3 beers a week); Tr. 2360 (Taylor admitted to drinking a half pint of liquor on June 8, 2010).) Moreover, Taylor's argument in this regard cannot withstand scrutiny in light of his admission during the July 6, 2011 hearing that, on occasion, he still drinks alcohol. (Tr. 55; *see also* Tr. 2064 (on January 12, 2011, Taylor reported that he had "'a couple of beers on Dec 24'"); Tr. 2472 (on June 24, 2011, Taylor reported that in the past year he drank alcohol two to four times a month, 1 to 2 drinks on each day he consumed alcohol).) Finally, Taylor's testimony that he last used cocaine in January of 2010 (Tr. 55) is completely destroyed by record evidence that he tested positive for cocaine use on March 8, 2010 and then on June 9, 2010 (Tr. 2053). Accordingly, a reasonable inference from the (Continued)

the ALJ's notation that since Dr. Fort's statement was propounded "during a period of active substance abuse on the part of the claimant" it could not be "considered applicable to his condition when abstinent." (Tr. 20.)

Plaintiff also contends that the ALJ erred in rejecting the June 23, 2011 opinions of Dr. Earnest Hudson, as well as what Taylor considers to be the most important portions of the November 15, 2010 medical opinions of Dr. John Howell. The Eleventh Circuit has determined that "the testimony of a treating physician must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis, supra*, 125 F.3d at 1440.

> The ALJ must clearly articulate the reasons for giving less weight to the opinion of the treating physician, and the failure to do so is reversible error. We have found "good cause" to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. We have also found good cause where the doctors' opinions were conclusory or inconsistent with their own medical records.

*Id*. (internal citations omitted); *see also Phillips, supra*, 357 F.3d at 1241 ("'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."). The Eleventh Circuit has also made clear that "[w]here the ALJ articulated specific reasons for failing to give the opinion of a treating physician controlling weight, and those reasons are supported by substantial evidence," a reviewing court may not "disturb the ALJ's refusal to give the opinion controlling weight." *Carson v. Commissioner of Social Security Administration*, 300 Fed.Appx. 741, 743 (11th Cir. Nov. 21, 2008) (citation omitted).

---

foregoing evidence would be that Taylor was abusing, at the very least, alcohol in February of 2010.

The Court finds that the ALJ articulated good cause for according little weight to Dr. Hudson's opinions regarding plaintiff's mental RFC. On June 23, 2011, Dr. Hudson noted marked or extreme limitations in all mental activities rated (Tr. 2456-2458) and, as correctly noted by the ALJ, these "severe" limitations are not supported by the doctor's treatment notes and clinical findings (Tr. 20-21). Indeed, on the date Hudson completed this form his clinical findings consisted of the following: "Mood is 'OK[.]' Affect is mildly constricted. Speech is WNL. Thoughts are structure[d], and free of SI/HI/AH/ and VH. Insight is good. Judgment is good." (Tr. 2473.) And one month earlier, on May 23, 2011, the staff psychiatrist's clinical observations were, as follows: "PT IS ALERT, 0 X 3 COOPERATIVE. MOOD: 'OK' AFFECT: FULL. SPEECH: NOL VOL, RATE, AND RHYTHM. THOUGHTS: GOAL DIRECTED. NO CURRENT SI/HI/AH/VH. INSIGHT: FAIR. JUDGMENT: GOOD." (*Id.*) In addition, the noted severe limitations in all areas are belied by other evidence of record from the first quarter of 2011. (*See, e.g.*, Tr. 2483 & 2486 (Taylor's social worker noted on February 17, 2011, and again on March 21, 2011, that claimant was alert and oriented x4, his thought processes were logical and goal directed, his mood/affect was pleasant and animated, his insight and judgment were good, and he denied and displayed no psychotic symptoms); Tr. 2488-2489 (Dr. Philip L. Cenac, a psychiatrist at the VA in Biloxi, made the following observations: "TAYLOR . . . is alert, cooperative and pleasant. The veteran is oriented as to person, place, time and situation. . . . TAYLOR . . . demonstrates no posturing or mannerisms. The veteran has no tremor of the upper or of the lower extremities. The patient demonstrates attention by being able to remember five numbers in the forward direction and four numbers in the reverse direction, a normal result but with effort. The veteran's thought processes were examined using the similarities subtest of the mental status examination and the findings are that the veteran's thought processes are logical

and goal directed, but, he struggles with the more abstract similarities. The veteran is able to test reality. TAYLOR . . . is not delusional. The veteran is not experiencing hallucinations. . . . The affect of this veteran is rather well modulated and stable.").) Finally, the limitations noted by Dr. Hudson were properly rejected inasmuch as in the comment section he stated that Taylor's "IMPAIRMENT PERSISTS DESPITE OVER ONE YEAR OF ABSTINENCE FROM DRUGS OF ABUSE," (Tr. 2458), a statement belied by record evidence, including the claimant's testimony that he still "occasionally" consumes alcohol (Tr. 55; *see also* Tr. 2472 (on June 24, 2011, Taylor reported that in the past year he drank alcohol two to four times a month, 1 to 2 drinks on each day he consumed alcohol)).[12]

With respect to Dr. Howell's November 15, 2010 PCE and pain assessment (Tr. 1222 & 1224), the ALJ engaged in the following analysis: "I give Dr. Howell's physical capacities evaluation significant weight, but I find that there is no objective evidence of cervical radiculopathy; electromyography was within normal limits. There is thus no basis for concluding that the claimant cannot perform at least occasional reaching, handling, fingering, feeling, and pushing and pulling with the left arm. Overall, the reported severity of symptoms is in excess of objective findings." (Tr. 21.) The undersigned can find no error with the ALJ's analysis in this regard inasmuch as the ALJ is absolutely right that electromyography was within normal limits (*compare* Tr. 966, 1240 & 1267-1268 *with* Tr. 942-943) and the ALJ's RFC finding that plaintiff is limited to "**no more than occasional reaching, handling, fingering, feeling, pushing**

---

[12]    As the foregoing "Fort and Hudson" discussion reflects, the mental portion of the ALJ's RFC assessment is supported by substantial evidence. (*See also* Tr. 881-898 & 1195-1212.)

and pulling with the *non-dominant arm*"[13] (Tr. 19 (some emphasis supplied)) is supported by other evidence in the record (Tr. 602 (normal x-rays of left shoulder on July 13, 2009); Tr. 642 (July 23, 2009 notation that plaintiff was doing pushups and walking for exercise); Tr. 673 (June 25, 2009 notation that Taylor planned to visit the "KT area to build up upper body"); Tr. 682 (June 24, 2009 note that Taylor enjoyed a wide-range of activities, including fishing, playing pool, and playing basketball); Tr. 931-932 (December 28, 2009 MRI of the left shoulder revealed no evidence of inflammation and only "[v]ery mild arthrosis at the acromioclavicular joint of questionable clinical significance."); Tr. 1463 (November 13, 2009 provocative testing of the left shoulder was negative); Tr. 2036 (March 15, 2010 normal x-rays of the left shoulder); Tr. 2268 (June 15, 2010 notation of the activities reportedly engaged in by Taylor over the course of the last year, including pool and active sports—football and basketball), including the physical RFC assessments completed by non-examiners Dr. Martin B. Lahr on September 18, 2009 (Tr. 876), Dr. Robert G. Haas on March 24, 2010 (Tr. 1194), and Dr. Richard Whitney on March 26, 2010 (Tr. 1216).[14]

---

[13]     Taylor is right-handed. (Tr. 2372.)

[14]     As for Dr. Howell's clinical assessment of pain (Tr. 1224), the Court agrees with the ALJ's determination that the severity of symptoms reported thereon is in excess of objective findings (Tr. 21), particularly Howell's notation that "[p]ain is present to such an extent as to be distracting to adequate performance of daily activities or work." (Tr. 1224.)  This portion of Howell's assessment is contradicted not only by the evidence of record just cited, particularly those notations regarding the significant level of activities in which Taylor engages (*see* Tr. 642, 682 & 2268), but, as well, by Howell's own PCE findings that in an 8-hour day Taylor can sit, stand, and/or walk eight hours each and can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds (Tr. 1222) and the notations in the record that Taylor is capable of working, either in the general community (Tr. 2057 ("Mr. Taylor . . . [h]as been trying to follow-up with possible job sources, such as the Alabama Career Center, but was told he was 'untrainable.' . . . We focused on problem solving strategies including how he might find a job on a bus line. He lives in Theodore and can access a WalMart, numerous restaurants and businesses. Plans to go job hunting in that area and we worked on helping him identify positive statements to make about himself and scripts for job searching."), or as part of the VA's paid transitional work experience ("TWE") program (*compare* Tr. 2366 (June 8, 2010 social worker (Continued)

Plaintiff's final argument is that the ALJ committed reversible error in failing to articulate or apply this Circuit's three-part pain standard. (*See* Doc. 16, at 14-15.) During oral argument, plaintiff's counsel modified his argument somewhat by focusing upon the ALJ's failure to discuss those factors identified in §§ 404.1529 and 416.929 of the Commissioner's regulations.

The Eleventh Circuit has consistently and often set forth the criteria for establishing disability based on testimony about pain and other symptoms. *See, e.g., Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citations omitted); *Holt v. Sullivan,* 921 F.2d 1221, 1223 (11th Cir. 1991).

> [T]he claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.[15] If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so. Failure to articulate reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true.

---

note that Taylor was "able to work and ha[d] been a CNA and housekeeper[]") *with* Tr. 2385 (April 29, 2010 notation that Taylor would be participating in TWE as a sanitation worker trainee, a job for which he did not request any work accommodations or limitations) and Tr. 2223 ("Mr. Taylor has participate in 163 hours . . . as a Sanitation Worker earning a total of $1,300 for his participation.")).

 Howell's pain assessment also reflects the opinion that "lifting overhead on [the] left" would greatly increase Taylor's pain to such a degree as to cause distraction from tasks or total abandonment of task. (Tr. 1224.) The ALJ's RFC assessment, as well as both hypotheticals posed to the vocational expert ("VE"), specifically account for Taylor's inability to perform overhead reaching (*compare* Tr. 19 ("**he is unable to perform overhead reaching**") *with* Tr. 64 & 67 (both hypotheticals posed by the ALJ assumed no overhead reaching)) and, therefore, there is no reason to suspect that the jobs identified by the VE would cause Taylor to experience distracting pain leading to total abandonment of tasks.

[15] "Medical history and objective medical evidence such as evidence of muscle atrophy, reduced joint motion, muscle spasm, sensory and motor disruption, are usually reliable indicators from which to draw a reasonable conclusion about the intensity and persistence of pain and the effect such pain may have on the individual's work capacity." SSR 88-13.

*Wilson, supra,* at 1225 (internal citations omitted; footnote added).

"20 C.F.R. § 404.1529 provides that once such an impairment is established, all evidence about the intensity, persistence, and functionally limiting effects of pain or other symptoms ***must*** be considered in addition to the medical signs and laboratory findings in deciding the issue of disability." *Foote v. Chater,* 67 F.3d 1553, 1561 (11th Cir. 1995) (emphasis supplied). In other words, once the issue becomes one of credibility and, as set forth in SSR 96-7p, in recognition of the fact that a claimant's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by objective medical evidence alone, the adjudicator (ALJ) in assessing credibility must consider in addition to the objective medical evidence the other factors/evidence set forth in 20 C.F.R. § 404.1529(c). More specifically, "[w]hen evaluating a claimant's subjective symptoms, the ALJ ***must*** consider the following factors: (i) the claimant's 'daily activities; (ii) the location, duration, frequency, and intensity of the [claimant's] pain or other symptoms; (iii) [p]recipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication the [claimant took] to alleviate pain or other symptoms; (v) treatment, other than medication, [the claimant] received for relief . . . of pain or other symptoms; and (vi) any measures the claimant personally used to relieve pain or other symptoms.'" *Leiter v. Commissioner of Social Security Administration*, 377 Fed.Appx. 944, 947 (11th Cir. May 6, 2010) (emphasis supplied), quoting 20 C.F.R. §§ 404.1529(c)(3); *see also* SSR 96-7p ("In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence . . . that the adjudicator ***must*** consider in

addition to the objective medical evidence when assessing the credibility of an individual's statements[.]" (emphasis supplied)).

In this case, the ALJ clearly recognized that plaintiff's impairments meet the pain standard (*see* Tr. 20 ("[T]he undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms[.]")) yet found that his subjective pain complaints were not entirely credible (*id*. ("[T]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment[.]"); *see also id.* at 21 ("The claimant reports chronic left-sided neck and shoulder pain. Left shoulder x-rays have been normal and magnetic resonance imaging reveals only minor degenerative change. On the other hand, cervical spine x-rays demonstrate moderately severe degenerative disc disease at C5-6 and C6-7. Nevertheless, the claimant has sought only intermittent treatment despite extensive access to medical care. He has reported good relief with a TENS unit and has not attempted to obtain further work-up or treatment for his cervical disc disease. . . . Overall, the reported severity of symptoms is in excess of objective findings.").[16] However, the Court need agree with plaintiff that the ALJ in this case, in making her credibility finding, *see Foote, supra,* at 1561, considered only the objective medical evidence of record and did not specifically consider the other factors/evidence set forth in 20 C.F.R. § 404.1529(c) (*see* Tr. 20-21). Any error by the ALJ in this regard though is harmless inasmuch as the record in this case is replete with evidence that Taylor engages in a wide range of daily activities (*see, e.g.,* Tr. 462, 642, 682, 2223 & 2268)

---

[16]     So, contrary to plaintiff's broader argument in his brief, the ALJ certainly articulated and applied at least a portion of this Circuit's three-part pain standard.

and the pain medication Taylor uses, Naproxen (Tr. 266), is indicated for the relief of mild to moderate pain, *compare* http://www.medicinenet.com/naproxen/article.html (last visited December 5, 2013) *with* http://www.drugs.com/cons/naproxen.html (last visited December 5, 2013). In addition, the ALJ's RFC assessment took into account that Taylor can perform no overhead reaching (Tr. 19) which is the one activity that is likely to aggravate his neck and left shoulder pain (*see* Tr. 1224 ("lifting overhead on [the] left" increases pain to such a degree as to distraction from tasks or total abandonment of tasks)). Finally, just two weeks prior to his July 6, 2011 hearing—specifically on June 24, 2011—plaintiff reported no pain (Tr. 2471), and there is at least one indication in the record that Taylor is not above exaggerating the extent of his pain (*see* Tr. 1463 & 1464 ("Provocative testing was negative, no complaint of pain. . . . When I asked the Veteran why I could move his arm but he could not, he donned his jacket with smooth, supple motions of shoulder and stated he did not need to come for therapy any longer.")). Thus, any failure by the ALJ to specifically consider the § 404.1529—and § 416.929—factors was harmless error.

Based upon the foregoing, this Court finds that the ALJ's determination that Taylor's substance abuse is a contributing factor material to his disability is supported by substantial evidence. The fact that some of the evidence, all of which the ALJ considered in her lengthy opinion, might suggest otherwise is of no moment given that substantial evidence supports the ALJ's determination in this regard.[17]

---

[17] The plaintiff makes no further arguments and since the ALJ's RFC assessment in this case, based on the claimant stopping his substance use (*see* Tr. 19), *see Carson, supra,* 300 Fed.Appx. at 743 ("the ALJ has the ultimate responsibility to assess a claimant's residual functional capacity[]"), is supported by substantial evidence and the vocational expert ("VE") identified jobs which exist in significant numbers in the national economy that an individual with such an RFC can perform (*see* Tr. 64-67), the decision to deny benefits in this case was appropriate.

<u>**CONCLUSION**</u>

It is **ORDERED** that the decision of the Commissioner of Social Security denying plaintiff benefits be affirmed.

**DONE** and **ORDERED** this the 9th day of December, 2013.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**